**2017 UT App 144**

## THE UTAH COURT OF APPEALS

I-D ELECTRIC INC.,
Appellee,
*v.*
LINDA GILLMAN,
Appellant.

Opinion
No. 20150682-CA
Filed August 10, 2017

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 110917777

Mark D. Stubbs and Barnard N. Madsen, Attorneys
for Appellant

Jeffrey T. Colemere and Brady T. Gibbs, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
GREGORY K. ORME and JILL M. POHLMAN concurred.

TOOMEY, Judge:

¶1     This case involves a contract for electrical services between a company and a homeowner and a mechanic's lien to secure payment for those services. What began as a dispute over less than $2,000 has ballooned into a judgment exceeding $36,000. Linda Gillman, the homeowner, appeals the district court's decision in favor of I-D Electric. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

¶2     On Thursday, March 10, 2011, Gillman approached Chet Hunter at an electrical wholesale supply store. She asked if he

was an electrician and if he could do some emergency electrical work at her house in Herriman. Hunter, a journeyman electrician, told Gillman to arrange an appointment through his employer I-D Electric (I-D). Later that day, I-D sent Hunter to Gillman's house to assess the scope of the work needed. Hunter spent approximately two hours discussing it with Gillman, who asked him how much the work would cost. Hunter told her he did not price the materials and therefore did not know how expensive the job would be. I-D usually used a "cost-plus"[1] system, under which the cost of materials and the hourly rate of the labor are calculated after a job is completed. Alternatively, at the customer's request, I-D used a bid system, under which it calculated the cost of the labor and materials in advance, and the price of the job is fixed at this amount. Gillman did not request a bid.

¶3     Hunter testified there was "a lot of work to be done," but Gillman's "priority" was work in the attic above the garage. Contractors were coming the following week to install a floor in the garage attic, and Gillman needed an electrician to move "all of the wires draped over the trusses in the attic." Because the work "needed to be done immediately," I-D rearranged Hunter's schedule to work on Gillman's project the very next day.

¶4     On Friday, Hunter returned to the Herriman house with two associates, a residential journeyman and an apprentice. They arrived before eight thirty that morning, and spent the entire day working on the projects Gillman had assigned. Gillman arrived later the same morning and occasionally went to the garage where the men were working. That afternoon, Hunter left briefly to buy additional supplies. While he was gone, the residential journeyman had Gillman sign a work order prepared by Hunter.

---

1. A cost-plus contract is one "in which payment is based on a fixed fee or a percentage added to the actual cost incurred." *Contract, Cost-plus Contract*, Black's Law Dictionary (9th ed. 2009).

The order, as it was initially presented to Gillman, did not indicate prices, but listed the materials used, summarized the completed jobs, and, under the heading "labor hours," identified each of the three electricians by first name. The work order also addressed the interest I-D would charge if the payment became past due and stated that the "[p]urchaser agrees to pay all costs and expenses including reasonable attorney's fees in the event collection becomes necessary." Gillman signed the work order and had left the house for the day by the time Hunter returned. The three men finished their work and left for the evening.

¶5 The following Monday morning, Kim Olson, I-D's president, calculated the cost of the electrical work at $1,827.61. He wanted to inform Gillman of this before I-D did additional work on the house. When Olson called her, Gillman was "stunned" by the amount. Olson offered to send her an itemization of the work order and have Hunter discuss the bill with her. Gillman asked how much the rest of the work would cost, which Olson interpreted as a request for a bid on the remaining work. Later that week, Hunter went to the Herriman house and tried to enter the garage, but the security access code had been changed and Gillman did not return his calls.

¶6 I-D sent Gillman an itemized invoice on March 24 and called her several times without reaching her and without receiving any return calls.[2] Gillman returned the invoice and

---

2. In its findings of fact, the district court stated:

> A pattern emerged regarding [Gillman's] unwillingness to directly confront the billing issue; in addition to habitually failing to return phone calls, she ignored several letters and written communications, including certified letters indicating legal proceedings would be or had been initiated. This willful neglect on the part of [Gillman] contributed greatly to the costs incurred by [I-D] in collecting the debt.

requested a labor breakdown and a list of the professional credentials of the electricians, which I-D provided at the beginning of April.

¶7    The next month, Gillman sent a letter to I-D, which read in part:

> [I]t is my considered judgment that the 25.5 hours charged for what was accomplished is commensurately unreasonable and warrants careful reconsideration. As you undertake that reconsideration, you might want to factor into your deliberation other salient information: I work in both construction and the practice of law. I am very familiar with job sites and courtrooms. I just completed the first $4.47 million phase of a 15-month construction project in December. The second $1.5 million phase is now underway and will be finished this summer. This recent construction project resulted from a multi-million construction defect lawsuit, out of state. The last five adversaries who lined up on the other side of a courtroom from me are out a total of more than $11 million.
>
> I hired another licensed electrician to finish the work in my house and garage[,] . . . [which was] substantially more complicated, representing at least five times more work. I paid $650 for all of it (labor only).
>
> I am willing to pay a realistic amount for the work that was done, but no more. Please recalculate it.

The letter's heading identified Gillman's return address as the Salt Lake City condominium in which Gillman lived. She used that address as a billing address and "in all of her correspondence."

¶8    Olson interpreted the letter as an attempt to "intimidate and bully" him and hired counsel. He instructed counsel to file a mechanic's lien on Gillman's property to secure payment of the bill. Counsel filed the lien, but erroneously listed Gillman's Salt Lake City billing address instead of the address of the Herriman house where the electrical work was done.[3]

¶9    I-D sent Gillman a Notice of Mechanic's Lien by certified mail, but it did not hear back from her. Later, I-D sent Gillman, also by certified mail, a notice of its intention to initiate a lien foreclosure action. Gillman testified she was out of town and did not receive either notice.[4] She testified that when she learned of the mechanic's lien, she checked with the county recorder's office but found no record of it.

¶10   I-D filed a complaint in district court in September 2011, and Gillman testified she did not discover the lien had listed the wrong address until the middle of October. In November, she and her counsel collaborated in drafting another letter, also using Gillman's Salt Lake City address, which Gillman delivered directly to I-D. The letter stated:

> Hasn't this already gone too far? First you file a lien on my property and I understand that has recently been followed by a lis pendens. Neither is either reasonable or justified under the circumstances, and without a legal basis. Please

---

3. The district court rejected Gillman's argument that I-D deliberately targeted her condominium for the lien: "[T]he Court concludes and finds that the placement of the lien on the condo rather than the Herriman house was a clerical error made by [I-D's] counsel and not a deliberate act to gain tactical advantage in the collection of the debt."

4. The district court concluded that Gillman's "avoidance of these letters was willful rather than circumstantial."

> remove both immediately. There is no point in the
> senseless . . . accumulation of any more legal fees.
> It's about time to do the right thing.

The letter did not notify I-D that its lien erroneously identified Gillman's Salt Lake City property and not her Herriman house.[5]

¶11 I-D was informed of the mistake by its counsel in December 2011, and it immediately released the lis pendens from Gillman's Salt Lake City property. I-D also recorded an amended lien with the address of the Herriman house.

¶12 I-D's complaint against Gillman alleged causes of action for breach of contract and lien foreclosure. Gillman filed a petition to nullify the lien as wrongful. In a partial motion for summary judgment, the district court dismissed the lien foreclosure action because the lien, originally listing the Salt Lake City address but amended with the correct Herriman address, was amended well outside the statutory deadline for filing a mechanic's lien. After a bench trial, the court determined that although the mechanic's lien was unenforceable, it was not wrongful. The court also determined the work order was a binding contract, even though it lacked a specific price term. Finally, the court awarded attorney fees to I-D under the contract, because the action was an "effort to collect a valid debt." The court did not award attorney fees to Gillman for defeating the mechanic's lien, but it reduced I-D's award of attorney fees by $3,632, which equaled the fees I-D generated in "active litigation of the Mechanic's Lien." Gillman appeals.

---

5. The district court characterized the letter as "deliberately vague." Indeed, it found Gillman "knew that the lien had been placed on the wrong property, and that she deliberately failed to mention that fact in the letter to Olson," and "did so, after consulting with counsel, in a deliberate effort to establish a cause of action against [I-D] for filing a wrongful lien."

ISSUES AND STANDARDS OF REVIEW

¶13    Gillman raises three issues on appeal. She contends the district court erred in determining I-D's mechanic's lien was not wrongful under the Wrongful Lien Act. *See* Utah Code Ann. § 38-9-1 (LexisNexis 2010).[6] "The question of what constitutes a wrongful lien . . . is a legal question of statutory interpretation," which we review for correctness. *Hutter v. Dig-It, Inc.*, 2009 UT 69, ¶ 8, 219 P.3d 918. Gillman also contends the district court erred in determining there was an express contract between herself and I-D. Whether a contract exists is also "a question of law, reviewed for correctness." *Cea v. Hoffman*, 2012 UT App 101, ¶ 9, 276 P.3d 1178. Finally, Gillman disputes the award of attorney fees. Gillman specifically contends she should be awarded attorney fees because she was the successful party under the mechanic's lien statute. "Whether attorney fees are recoverable in an action is a question of law, which we review for correctness." *Anderson & Karrenberg v. Warnick*, 2012 UT App 275, ¶ 8, 289 P.3d 600 (citation and internal quotation marks omitted).

ANALYSIS

I. Wrongful Lien

¶14    Gillman contends the district court erred in determining that I-D's mechanic's lien was not wrongful. The district court concluded the lien was authorized by statute even though it misidentified the property subject to the lien, and further determined "there was a good-faith basis for filing the lien" and "the lien was misplaced due to an explainable error."

---

6. Because I-D filed its mechanic's lien in 2011, we reference the version of the Utah Code in effect at that time.

¶15    The relevant section of the Utah Code defines a wrongful lien as "any document that purports to create a lien, notice of interest, or encumbrance on an owner's interest in certain real property and at the time it is recorded is not . . . expressly authorized by this chapter or another state or federal statute." Utah Code Ann. § 38-9-1(6) (LexisNexis 2010). The Wrongful Lien Act "does not apply to a person entitled to a lien under Section 38-1-3 who files a lien pursuant" to the mechanic's lien statute, *id.* § 38-9-2, which allows "all persons performing any services" on a property to "have a lien upon the property . . . for the value of the service rendered," *id.* § 38-1-3.

¶16    Gillman argues the Wrongful Lien Act "does not automatically prohibit *any* mechanic's lien from being wrongful." Rather, it "only prohibits a mechanic's lien filed by 'a person entitled to a lien.'" (Emphasis omitted.) In effect, Gillman argues that the Wrongful Lien Act *could* apply to a mechanic's lien if the person filing it is not "entitled to" a lien under that statute. Further, because I-D listed the Salt Lake City property on its mechanic's lien, Gillman argues the lien was not "expressly authorized" by statute, and therefore I-D was not entitled to it.

¶17    The Utah Supreme Court considered "whether an unenforceable mechanic's lien is a wrongful lien subject to nullification under Utah's Wrongful Lien Injunction[s] Act"[7] in *Hutter v. Dig-It, Inc.*, 2009 UT 69, ¶¶ 1, 46–52, 219 P.3d 918. In that case, the parties contested the meaning of the phrase, "expressly authorized by . . . statute." One party, whose mechanic's lien was unenforceable, argued that "*all* mechanic's liens—even if they ultimately prove unenforceable—are expressly authorized by statute and therefore are not wrongful liens." *Id.* ¶ 46 (emphasis added). The opposing party's argument, similar to Gillman's, was that "unenforceable lien[s]

---

7. *See* Utah Code Ann. § 38-9a-201 (LexisNexis 2010). This section of the Utah Code provides a mechanism for seeking to enjoin wrongful liens.

cannot be expressly authorized by statute since the statute only allows liens to be recorded that comply with the statutory terms." *Id.*

¶18 The supreme court determined that the phrase "expressly authorized" was ambiguous, and so it "look[ed] to [the] legislative history as an aid to ascertain the intent of the legislature." *Id.* ¶ 49. During the floor debates of the pertinent bill, the sponsoring senator stated that the bill's purpose "was to impose penalties on those filing common law liens on the property of public officials in retaliation for prosecution." *Id.* ¶ 50. Another senator was concerned that the bill's "definition of a wrongful lien was too broad for the bill's expressed purpose." *Id.* The sponsoring senator replied, "'This act is not intended to be applicable to mechanic's or materialmen's liens.'" *Id.* (quoting Senate Floor Debates, S.B. 178, 42nd Leg., Gen. Sess. (Utah Feb. 21, 1985) (statement of Sen. Ivan M. Matheson)). From this history, the supreme court concluded that "the legislature intended that the definition of 'wrongful lien' should encompass only common law liens." *Id.* ¶ 52. Mechanic's liens, even if unenforceable, are expressly authorized by statute, and contrary to Gillman's argument, are not wrongful under the Wrongful Lien Act. *Id.*

¶19 Gillman's reply brief attempts to distinguish *Hutter* by arguing that the lien I-D filed was not actually a mechanic's lien because the lien did not comply with the statutory requirements of a mechanic's lien. According to Gillman, the Wrongful Lien Act therefore would apply.

¶20 We addressed a similar question in *Bay Harbor Farm, LC v. Sumsion*, 2014 UT App 133, 329 P.3d 46. There, the district court determined that an attorney's lien was wrongful because it did not meet the requirements of the attorney's lien statute. *Id.* ¶ 8. The statute in question allowed an attorney to place a lien on a person's property (1) if the person was the attorney's client and (2) if the person's property was the subject of or connected with work performed for the client. *Id.* (citing Utah Code Ann. § 38-2-

7(2) (LexisNexis 2010)). The district court determined that the client's property "was not the subject of or connected with [the attorney's] work on the . . . matter." *Id.* (internal quotation marks omitted). Because the lien did not meet the requirements of the attorney's lien statute, the district court determined it was wrongful under the Wrongful Lien Act. This court reversed on appeal, concluding that the attorney "filed an attorney's lien which is expressly authorized by statute, and it is therefore not wrongful. *This is true even if it ultimately proves unenforceable.*" *Id.* ¶ 11 (emphasis added).

¶21    *Bay Harbor Farm* also clarified what qualifies as a statutory lien under the Wrongful Lien Act: it is not created merely by an allegation that the lien is expressly authorized by statute; rather, a "lien claimant [must have] a good-faith basis for claiming a statutory lien." *Id.* ¶ 12. "If the claimant has 'no plausible basis' for recording a statutory lien, 'a court may declare the lien wrongful under the Wrongful Lien Act even if it purports to be one falling into the category of statutorily authorized liens.'" *Total Restoration, Inc. v. Merritt*, 2014 UT App 258, ¶ 18, 338 P.3d 836 (quoting *Bay Harbor Farm*, 2014 UT App 133, ¶ 12). The attorney in *Bay Harbor Farm* ultimately may not have been entitled to an attorney's lien if the property was not connected to the work performed by the attorney. But the lien was not wrongful because the attorney had a good-faith basis for his claim under the attorney's lien statute.

¶22    In sum, *Hutter* determined that only common law liens may be wrongful liens and that the Wrongful Lien Act does not apply to liens, which though unenforceable, are not wrongful. But *Bay Harbor Farm* offers the means of determining when a lien is properly characterized as a statutory lien.

¶23    Here, I-D filed a mechanic's lien to secure payment for electrical services rendered on Gillman's property. I-D was entitled to place the lien on the Herriman house, but unintentionally identified Gillman's Salt Lake City address in its notice of lien. As soon as it realized the error, I-D had the lien

removed from the Salt Lake City property. We agree with the district court that I-D had a "good-faith basis for filing the lien." It had completed electrical services on the Herriman house, and it listed the wrong address on the lien as a result of a clerical error on the part of its attorney. The error was inadvertent—the address used was the one Gillman used on the letter by which she disputed the work order—and does not transform I-D's attempt to secure payment into a common law lien. Because the Wrongful Lien Act applies only to common law liens and because I-D had a good faith basis for claiming a statutory lien, the district court correctly determined that I-D's lien was not wrongful.

## II. Express Contract

¶24    Gillman next contends the district court erred in determining there was an express contract between the parties in the absence of an agreement as to the cost of the work performed on her property. Gillman argues that because there was no agreement as to price, there cannot have been a meeting of the minds.

¶25    "It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract. An agreement cannot be enforced if its terms are indefinite." *Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 11, 78 P.3d 600 (citation and internal quotation marks omitted). A "contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id.* ¶ 12 (citation and internal quotation marks omitted). "The court must be able to enforce the contract according to the parties' intentions; if those intentions are impenetrable, or never actually existed, there can be no contract to enforce." *Id.*

¶26    In *Electrical Contractors, Inc. v. Westwater Farms, LLC*, 2016 UT App 60, 370 P.3d 949, the "fact that the parties did not know

what the ultimate cost would be d[id] not demonstrate . . . that there was no meeting of the minds." *Id.* ¶ 11. In that case, the parties agreed to a cost-plus payment structure where one party charged the other the actual cost, plus certain, set fee markups on specified items. "While the cost-plus terms did not establish a precise price to be paid, they did provide a clear method of calculating the price once the work was completed . . . [and thus] the essential terms of the oral contract were established . . . ." *Id.*

¶27 Other states have determined that a missing price term does not necessarily prevent a contract from being formed or enforceable. *See Goodman v. Physical Res. Eng'g, Inc.*, 270 P.3d 852, 855 (Ariz. Ct. App. 2011) ("An agreement can be implied and is enforceable where there is a valid offer and acceptance, and the only term missing is the final price."); *MBH, Inc. v. John Otte Oil & Propane, Inc.*, No. A-00-287, 2001 WL 880683, at *3 (Neb. Ct. App. Aug. 7, 2001) ("[A] contract will not necessarily fail for indefiniteness with regard to an open price term . . . if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." (citation and internal quotation marks omitted)); *Fischer v. CTMI, LLC*, 479 S.W.3d 231, 240 (Tex. 2016) ("[W]hen the parties have done everything else necessary to make a binding agreement . . . , their failure to specify the price does not leave the contract so incomplete that it cannot be enforced."(omission in original) (citation and internal quotation marks omitted)).

¶28 Here, we agree with the district court that there was a meeting of the minds on the integral features of the contract. Gillman requested electrical services from I-D and discussed with Hunter the scope of those services. When Gillman asked how much it would cost, Hunter responded that he did not calculate the price of materials and did not know what it would cost, implying the cost would be calculated after the job. I-D's general practice was to use a cost-plus payment system, where the cost was calculated after the work, unless the customer specifically requested a bid. I-D intended to receive payment

from Gillman and Gillman intended to pay I-D. A court may enforce the contract according to those intentions.

¶29    In addition, Gillman signed the work order listing the materials used, the jobs completed, and the number of electricians who would be paid for their labor. Although the method for calculating the price may not have been as clear as in *Electrical Contractors*, there was a written contract specifying each item to be paid for and each person whose labor would be billed. Gillman, an experienced business woman, knew she would have to pay for the labor and materials of the jobs completed. She signed the work order detailing these expenses (albeit without specific price terms), knowing it evidenced her obligation to pay. Gillman was also aware that the cost would be calculated by I-D after the work was completed. The fact that Gillman later disagreed with what was charged does not mean the agreement was not sufficiently definite to be enforced.

¶30    But even though Gillman demonstrated her intention and obligation to pay by signing the contract, she was not bound to pay *any* amount later calculated by I-D; Gillman was only obligated to pay a reasonable price. *See Standard Coal Co. v. Stewart*, 269 P. 1014, 1016 (Utah 1928) ("Where the parties have agreed upon the other elements of the sale, but have made no reference to the price, . . . the law implies that the goods are to be paid for at what they are reasonably worth." (omission in original) (citation and internal quotation marks omitted)); *Fischer*, 479 S.W.3d at 240 ("[W]hen the parties have done everything else necessary to make a binding agreement . . . , their failure to specify the price does not leave the contract so incomplete that it cannot be enforced. In such a case it will be presumed that a reasonable price was intended." (omission in original) (citations and internal quotation marks omitted)); *see also United States v. Swift & Co.*, 270 U.S. 124, 141 (1926) ("Under ordinary conditions, a valid agreement can be made for purchase and sale without the fixing of a specific price. In such a case a reasonable price is presumed to have been intended."); *Interstate Plywood Sales Co. v. Interstate Container Corp.*, 331 F.2d 449, 452

n.6 (9th Cir. 1964) (stating that, under California law, "where the contract entirely fails to mention price[,] it will then be implied that the parties intended to deal at a reasonable price"); *cf. Mills v. Brody*, 929 P.2d 360, 367 (Utah Ct. App. 1996) ("Where the contract is silent as to when tender of the purchase price is required, [c]ourts universally read into such contracts an obligation of payment within a time reasonable in the context of the transaction and circumstances of the parties." (alteration in original) (emphasis, citation, and internal quotation marks omitted)). The district court correctly concluded that the contract was enforceable, but did not make a determination regarding the reasonableness of the price term, which I-D calculated after Gillman had signed the work order.

¶31　Whether a price is reasonable is a question of fact. *Cf. Mills*, 929 P.2d at 367 (stating that, in determining the reasonable timing of payment on a contract, what "is reasonable is a question of fact" (emphasis, citation, and internal quotation marks omitted)). There was testimony from both sides regarding the reasonableness of the contract price, but because the district court is the finder of fact, we will not substitute our judgment regarding whether the contract price was reasonable for that of the district court. Therefore, we remand this case for the limited purpose of determining whether the contract price I-D charged Gillman was reasonable. If the district court determines the contract price was reasonable, its judgment concerning Gillman will remain unchanged. If the court determines the contract price was not reasonable, it will determine the reasonable price for Gillman to fulfill her obligation under the contract.

### III. Attorney Fees

#### A.　Jurisdiction

¶32　As a preliminary matter, I-D contends this court lacks jurisdiction to hear Gillman's claim concerning attorney fees. It notes that Gillman raised this issue in her rule 52(b) motion to amend the district court's findings and conclusions, and argues

Gillman failed to timely appeal the district court's order denying her motion.

¶33    After a bench trial, the district court entered its findings of fact and conclusions of law. It determined I-D prevailed on its breach of contract claim and could be entitled to reasonable attorney fees, and it directed I-D to submit a proposed order regarding the fees. The court also determined there was no cause of action for which Gillman could be entitled to attorney fees.

¶34    Gillman then filed a rule 52(b) motion to amend the court's findings of fact and conclusions of law, arguing she was entitled to statutory attorney fees for her successful defense of the mechanic's lien claim. The district court denied her motion, granted I-D's motion regarding the amount of attorney fees, and entered final judgment. The court amended its judgment a week later to include a current calculation of I-D's attorney fees, and within thirty days, Gillman appealed.

¶35    "As a general rule, an appellate court lacks jurisdiction over an appeal that is not taken from a final order or judgment." *Anderson v. Wilshire Invs., LLC*, 2005 UT 59, ¶ 9, 123 P.3d 393 (citing Utah R. App. P. 3(a)). Rule 4(b)(1)(B) of the Utah Rules of Appellate Procedure extends this time for appeal when certain post-trial motions are filed. A party who files a rule 52(b) motion has thirty days from the entry of the court's order on the motion to appeal the final judgment when the rule 52(b) motion is filed in timely fashion after the judgment is entered. Utah R. App. P. 4(b)(1)(B).

¶36    I-D contends that because Gillman raised the attorney-fee issue in her rule 52(b) motion, she had to appeal the court's denial of that motion within thirty days. Here, however, Gillman filed her rule 52(b) motion *before* the district court had entered a final judgment.

¶37    In its final judgment and amended judgment, the district court summarized the judgment entered against Gillman and listed the damages, attorney fees, costs, and interest awarded to

I-D. Gillman appealed this final order within the thirty-day deadline, *see id.* R. 3(a), 4(a), and we readily conclude we have jurisdiction to hear her claim regarding attorney fees.

### B.     Attorney Fees Award

¶38     Gillman disputes the district court's award of attorney fees to I-D. The court determined I-D prevailed on its contract claim and successfully defeated Gillman's wrongful lien claim. Because Gillman had breached the contract and because the work order included a provision for attorney fees, the court awarded I-D $36,939.29 for damages, fees, costs, and interest. I-D's award was reduced by $3,632 for fees generated in litigation of the mechanic's lien, which Gillman defeated on summary judgment.

¶39     Gillman first argues she is entitled to attorney fees under the mechanic's lien statute. She also argues the court erred in awarding attorney fees to I-D on the basis of the parties' contractual provision. "Attorney fees are generally recoverable in Utah only when authorized by statute or contract." *Reighard v. Yates*, 2012 UT 45, ¶ 41, 285 P.3d 1168 (citation and internal quotation marks omitted). Both parties request attorney fees on appeal.

### 1.     Attorney Fees Under the Mechanic's Lien Statute

¶40     Gillman first contends she is entitled to statutory attorney fees for defeating I-D's mechanic's lien. She argues she was the successful party and asserts that "courts do not have discretion to decide whether to award reasonable attorney fees to the 'successful party.'" *See A.K. & R. Whipple Plumbing & Heating v. Guy*, 2004 UT 47, ¶ 7, 94 P.3d 270 (citation omitted).

¶41     Under the mechanic's lien statute, "the successful party shall be entitled to recover a reasonable attorneys' fee," Utah Code Ann. § 38-1-18(1) (LexisNexis 2010), and a "successful party includes one who successfully enforces or defends against a lien action," *Kurth v. Wiarda*, 1999 UT App 335, ¶ 9, 991 P.2d

¶13. I-D argues that courts have considerable discretion in determining which party was the successful party under the statute. *See R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119 (noting the question of which party is the prevailing party "depends, to a large measure, on the context of each case, and, therefore, it is appropriate to leave this determination to the sound discretion of the trial court"). I-D further argues the district court acted well within its discretion when it determined I-D was the successful party.

¶42 In determining "whether a party was 'successful' in bringing or defending against a mechanic's lien enforcement action," this court uses "a 'flexible and reasoned' approach." *See A.K. & R.*, 2004 UT 47, ¶ 26. This approach considers the net judgment in the case and "the amounts actually sought[,] and then balanc[es] them proportionally with what was recovered." *Id.* (citation and internal quotation marks omitted). The approach also considers common sense factors such as

> (1) [the] contractual language, (2) the number of claims, counterclaims, cross-claims, etc., brought by the parties, (3) the importance of the claims relative to each other and their significance in the context of the lawsuit considered as a whole, and (4) the dollar amounts attached to and awarded in connection with the various claims.

*Anderson & Karrenberg v. Warnick*, 2012 UT App 275, ¶ 11, 289 P.3d 600 (alteration in original) (quoting *R.T. Nielson*, 2002 UT 11, ¶ 25).

¶43 In awarding attorney fees to I-D, the district court determined that I-D prevailed on its breach of contract claim, and that because the contract had a provision for attorney fees, I-D was entitled to reasonable attorney fees. The court ruled against Gillman on the breach of contract claim and the wrongful lien claim and recognized "no cause of action for which [Gillman] may be entitled to fees." Contrary to I-D's argument, the court did not address which party had been

successful under the mechanic's lien statute, and did not engage in the "flexible and reasoned approach" as outlined by *A.K. & R.* and *Anderson*. The court stated only that I-D was successful in its breach of contract claim as it related to attorney fees.

¶44 Furthermore, the mechanic's lien action was distinct from the breach of contract and wrongful lien claims and was dismissed early on in the case. I-D brought a mechanic's lien claim against Gillman, and Gillman successfully defeated that claim on summary judgment. The court also recognized I-D was not entitled to fees it generated in seeking to enforce its mechanic's lien. We therefore see no reason why Gillman should not be entitled to attorney fees under the mechanic's lien statute. While these fees may be relatively small in proportion to the award I-D was correctly granted, *see infra* ¶¶ 45–47, we remand for the district court to determine the amount of fees Gillman is entitled to, by way of an offset against the judgment against her, for successfully defeating the mechanic's lien claim.

2.     Attorney Fees Under the Contractual Provision

¶45 Next, we conclude the district court correctly awarded I-D attorney fees on the basis of the work order's contractual language. The work order stated that the purchaser "agrees to pay all costs and expenses including reasonable attorney's fees in the event collection becomes necessary." "If the legal right to attorney fees is established by contract, Utah law clearly requires the court to apply the contractual attorney fee provision and to do so strictly in accordance with the contract's terms." *Hahnel v. Duchesne Land, LC*, 2013 UT App 150, ¶ 16, 305 P.3d 208 (citation and internal quotation marks omitted).

¶46 I-D brought this action to secure payment of its work. In pursuit of collecting its payment, I-D successfully brought a breach of contract claim and successfully defended against Gillman's counterclaim. Therefore, there is no error in the court's decision to award I-D attorney fees under the contract, especially where the court concluded that the expenses in the case had

been "exacerbated by [Gillman's] continued and unreasonable efforts to avoid paying a contractual obligation."

¶47    Additionally, Gillman alleges the district court erred in determining there was an express contract and I-D failed in its burden of proof under a quasi-contract claim. She argues she should therefore be awarded attorney fees under the reciprocal attorney fee statute. *See* Utah Code Ann. § 78B-5-826 (LexisNexis 2012). As we concluded above, however, the district court correctly determined there was an express contract, and we discern no other error in the award of attorney fees for the breach of contract claim.

¶48    In sum, the district court correctly awarded I-D attorney fees under the breach of contract claim, but it incorrectly denied Gillman attorney fees under the mechanic's lien statute.

3.    Attorney Fees on Appeal

¶49    Finally, I-D requests an award of attorney fees on appeal. "[W]hen a party who received attorney fees below prevails on appeal, the party is also entitled to fees reasonably incurred on appeal." *Valcarce v. Fitzgerald*, 961 P.2d 305, 319 (Utah 1998) (citation and internal quotation marks omitted). As we previously determined, the district court correctly dismissed Gillman's wrongful lien claim and correctly determined there was an express contract between I-D and Gillman. Though the court incorrectly denied Gillman attorney fees under the mechanic's lien statute, these fees are relatively minor when compared to I-D's award under the contract. We thus conclude I-D is entitled to reasonable attorney fees for the issues on which it succeeded on appeal. We remand for the district court to determine the amount of fees properly to be awarded to I-D.

CONCLUSION

¶50    In sum, we conclude the district court correctly determined I-D's mechanic's lien was not wrongful under the

statute. We also conclude the court correctly determined there was an express contract between I-D and Gillman, even though the contract did not include a price term. Finally, we conclude the court erred in denying Gillman attorney fees for defeating the mechanic's lien claim, and direct the court to adjust I-D's attorney fee award accordingly. We remand the case for the limited purposes of determining whether the contract price was reasonable, adjusting I-D's attorney fee award, and calculating I-D's reasonable attorney fees incurred on appeal.

———————